F I L E D
SUPERIOR COURT
OF GUAM

2018 MAY 29 PM 2: 20

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| FAMILY FINANCE COMPANY, INC., A Guam Corporation,<br><br>                      Plaintiff,<br><br>       vs.<br><br>ROSEMARIE B. CAMACHO, individually and as administratrix of the ESTATE OF ROSAMUNDE BORDALLO BELL, dec., JOHN RICHARD BORDALLO BELL, and BALTAZAR JEROME BORDALLO BELL,<br><br>                 Defendants. | Superior Court Case No. <u>CV1339-17</u><br><br><br>**DECISION AND ORDER<br>re<br>DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE, CONSOLIDATE CV1339-17 AND PR0075-15<br>AND<br>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

The parties request a ruling from the Court regarding which of them is responsible to pay tax liabilities stemming from a distribution of a probate case. The Court determines that the Estate of Rosamunde Bordallo Bell, which received a partial distribution from the Estate of Baltazar J. Bordallo, but assigned a portion of its share to Plaintiff Family Finance Company, Inc. ("FFC") must pay any tax incurred on the distribution. The Court therefore DENIES the Motion to Dismiss filed by Defendants Rosemarie B. Camacho, individually and as Administratrix of the Bell Estate, John Richard Bordallo Bell, and Baltazar Bordallo Bell, and GRANTS FFC's Motion for Summary Judgment.[1]

### I. UNDISPUTED FACTS

---

[1] Attorney Oliver Weston Bordallo represents FFC; the Law Office of John R. B. Bell represents Defendants.

## ORIGINAL

1.  On December 24, 2015, Camacho, as Administratrix of the Bell Estate, and FFC entered into a Settlement Agreement and Mutual Release of Claims ("Agreement"). Compl., Ex. 1; Opp'n Mot. Summ. J. at 2. The Agreement included as parties: Arlene P. Bordallo and Penelope B. Hofschneider, as Successor Co-Trustees of the Paul J. Bordallo Trust Dated October 11, 2006, and Camacho, John R. B. Bell, and Baltazar J. B. Bell

2.  The Agreement's Recitals acknowledge the following:

    a.  Rosamunde Bell[2] executed a series of promissory notes and an assignment of all of her right, title and interest in the Estate of her father, Baltazar J. Bordallo, PR0030-88,[3] in favor of FFC. Agreement, Recital IV.

    b.  In the Bell Estate probate case, PR0075-15, FFC had filed an Amended Creditor's Claim for $158,660.77. Agreement, Recitals I, II.

    c.  While the Administratrix disputed FFC's Amended Creditor's Claim in PR0075-15 and FFC's secured claim in PR0030-88 as the decedent's creditor-assignee, the parties reached an agreement "to forever resolve and settle this dispute on the terms and conditions set forth herein." Agreement, Recital V.

3.  To resolve that dispute, the parties agreed that: "The 1991 Loan Agreement and Assignment are hereby amended and modified to authorize and empower FFC to petition for and collect up to, but not exceeding, the sum of FIFTY THOUSAND DOLLARS ($50,000.00), without interest, from decedent's share of any future distributions out of the BJB Estate in

---

[2] Also referred to as "decedent."
[3] Also referred to as "BJB Estate."

ORIGINAL

PR0030-88. . . . FFC shall accept the sum of $50,000.00, without interest, in full accord, satisfaction and discharge of any and all obligations of decedent." Agreement ¶ 3.

4.     Relevant to this proceeding, the Agreement also included the following provisions:

a.  "General Release.  For and in consideration of the full and timely performance of all terms and conditions of this Agreement in the manner prescribed herein, including all payments, assignments, conveyances, releases, dismissals, waivers, covenants, warranties and representations, *each Party . . . hereby releases all other Parties . . . from any and all* claims, demands, causes of action, obligations, liens, *taxes*, damages, losses, costs, attorneys' fees and expenses of every kind and nature whatsoever, whether arising in tort or contract, law or equity (including malicious prosecution, abuse of process, or similar claim or action), *known or unknown, suspected or unsuspected*, which any of them have against any of the other Parties by reason of any past act, cause or thing arising out of or related to the subject of this Agreement." Agreement ¶ 9 (emphases added).

b.  "Unknown Claims.  The Parties agree that the General Release set forth above extends to and includes any and all claims, liability, damages and causes of action that the Parties do not presently anticipate, know or suspect to exist, but which may develop, accrue or be discovered in the future.  THE PARTIES EXPRESSLY WAIVE ALL RIGHTS UNDER 18 GCA § 82602 . . . ." Agreement ¶ 10.

ORIGINAL

c.  "The Parties agree that this Agreement is entered into without duress, in good faith and for sufficient consideration, and that it is fair, just and reasonable to all Parties." Agreement ¶ 11.

d.  "Covenant Not to Sue. Each of the Parties covenants and agrees that each Party will not . . . commence, aid in any way . . . prosecute or cause or permit to be commenced or prosecuted against any other Party . . . any action or other proceeding based upon any claim arising out of, or relating to the subject of this Agreement *save and except only any breach of this Agreement.*" Agreement ¶ 12 (emphasis added).

e.  "Construction. This agreement is the product of arms length negotiation and preparation by and among each party and with the benefit of advice from their respective attorneys. Accordingly, all Parties acknowledge and agree that this Agreement shall not be deemed prepared or drafted by one party or another, or the attorneys for one party or another, and shall be construed accordingly. As such neither Party will claim that any ambiguity in this Agreement shall be construed against the other Party." Agreement ¶ 15.

f.  "[I]n the event any action or proceeding is brought to enforce this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs in addition to all other relief to which that party or those parties may be entitled." Agreement ¶ 17.

5.  On September 29, 2017, Bank of Guam Cashier's Check No. 975628 was issued to "Rosemarie B. Camacho, John B. Bell, Baltazar B. Bell AND Family Finance Company,

ORIGINAL

INC." in the amount of $51,530.82. The Check contains a notation: "RE: PR0030-88." Compl., Ex. 2.

6.     This amount mirrors that stated in the Order Approving Third Account and Report of Administration, Allowance of Commission and Preliminary Distribution in PR0003-88 and filed on September 27, 2017. In that Order, the probate court recognized that "Probate administration is not yet in a condition to be closed as additional property sales and/or [sic] partition are pending, however, that a preliminary distribution can also be made to heirs, including to Rosemarie B. Camacho, John B. Bell, Baltazar B. Bell and Family Finance Company, Inc." *Id.*

7.     FFC filed this action on December 29, 2017, alleging that Defendants here refuse to endorse the cashier's check. FFC alleges four causes of action: Specific Performance; Declaratory Judgment; Alternative Claim: Reformation; and Attorneys Fees and Costs.

8.     Defendants posit that they "are not refusing to endorse the settlement check to FFC. Defendants are presently unable to endorse the check to FFC as a result of FFC's tax threats, settlement breach, and FFC's blatant intention to further disregard the settlement agreement." Defs.' Mot. Dismiss at 7 (Feb. 20, 2018).

## II.     DEFENDANTS' MOTION TO DISMISS

Defendants moved to dismiss this case on the basis that FFC failed to state a claim for which relief can be granted under Rule 12(b)(6), and that FFC's claims are frivolous and intentionally vexatious. Defendants moved, in the alternative, to consolidate this case with PR0075-15 to allow one judge to consider issues related to the Bell Estate.

ORIGINAL

On the latter argument, during the motion hearing, the Court asked Attorney Bell whether Defendants still sought consolidation given that the undersigned Judge presides over both cases. In response, Mr. Bell withdrew the request to consolidate.

Moreover, the Court asked Mr. Bell to specify whether Defendants' dismissal arguments pertain to FFC's alleged failure to state a claim for relief, or whether they pertain to the underlying merits of FFC's action. Mr. Bell conceded that the arguments in Motion to Dismiss were more appropriate as seeking summary judgment in Defendants' favor. Defendants also submitted documents outside of the pleadings in support of their Motion to Dismiss, thereby converting it to a summary judgment motion. *See* Reply in Support Defs.' Mot. Dismiss; Sworn Stmt. of Baltazar J. B. Bell (March 30, 2018). Because of Defendants' concessions, the Court will incorporate Defendants' arguments in their Motion to Dismiss briefing as part of their arguments seeking and opposing summary judgment.

## III.      FFC'S MOTION FOR SUMMARY JUDGMENT

### A.      Standard for Summary Judgment

Guam Rule of Civil Procedure 56(c) provides that a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A genuine issue of fact exists when "there is 'sufficient evidence' which establishes a factual dispute requiring resolution by a fact-finder." *Iizuka Corp. v. Kawasho Int'l (Guam), Inc.*, 1997 Guam 10 ¶ 7 (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)). "A 'material' fact is one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. . . . Disputes over irrelevant or unnecessary facts will not preclude a

ORIGINAL

grant of summary judgment." *Iizuka Corp.,* 1997 Guam 10 ¶ 7.

### B.    Who Pays the Tax

At the motion hearing, the parties agreed that the plain language of the Agreement contains no ambiguity and that each party "stands by"[4] the Agreement. Although the parties differ in the interpretation of that plain language, they agree that the language itself is unambiguous. The Court's task, therefore, is to interpret the plain language of the Agreement and determine how the Agreement handles the tax repercussions of the distribution.

In interpreting the language of a contract, "the task of the court is to discern and give legal effect to the intent of the parties at the time of contracting." 18 GCA § 87102 (2005); *Wasson v. Berg,* 2007 Guam 16 ¶ 10. Further, the intent of the parties to a contract is generally, and whenever possible, restricted by the plain meaning of the contract terms. *See Camacho,* 1997 Guam 5 ¶ 33; 18 GCA § 87104 (2005).

The Agreement's plain language does not explicitly discuss how to handle the tax consequences stemming from decedent's share of distributions from the BJB Estate. Paragraph 3 of the Agreement "authorize[s] and empower[s] FFC to petition" up to $50,0000.00 from decedent's share, and that FFC shall accept that $50,000.00, without interest, "in full accord, satisfaction and discharge" of decedent's obligations to FFC. However, this language does not plainly require FFC to also pay a share of the tax imposed on the decedent's share of the BJB Estate distribution.

Instead, within the four corners of the document, the parties to the Agreement addressed tax issues in paragraph 9 regarding the parties' "General Release." In that provision, the parties agreed that in consideration of the "full and timely performance of all terms and conditions of

---

[4] Defendants' counsel used this term in his oral arguments.

this Agreement[,] . . . each party . . . hereby releases all other Parties . . . from and all claims, demands, causes of action, obligations, liens, *taxes*, damages, losses, costs, attorney's fees and expense of every kind and nature whatsoever, whether arising in tort or contract, law or equity . . . *known or unknown, suspected or unsuspected*, which any of them have against any of the other Parties . . . ." Agreement ¶ 9 (emphasis added). As this language indicates, the parties contemplated there could be known or unknown, suspected or unsuspected taxes, and in that event, each party released the other parties from being liable for that party's tax obligations. While Defendants argue that they could not have known of tax obligations, the plain language squarely releases all parties from paying the tax obligations of any other party, regardless of whether the obligation was known or suspected when the Agreement was executed.

Therefore, to resolve who must pay taxes imposed on decedent's share of the distribution from the BJB estate, the Court looks to legal authorities on which party acquires a tax liability. The general rule is that the party who earns the income must pay the tax on it. The U.S. Supreme Court first established this doctrine in *Lucas v. Earl*, 281 U.S. 111 (1930), in which the court held a taxpayer liable for wages he earned but had assigned to his wife. The court reached this conclusion after noting that the husband was the only party to the contract of employment and the only person earning the wages. *Id.* at 114. As Justice Holmes iterated: "no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributable to a different tree from that on which they grew." *Id.* at 115.

As similarly held in *Comer v. Davis*, 107 F.2d 355, 357 (5th Cir. 1939), a case also involving the assignment of income earned, "earned income is taxable to those who earn it, *notwithstanding a contractual disposition after it is received.*" (Emphasis added). Interestingly,

ORIGINAL

the issue "is not so much a matter of statutory construction as a challenge to the power of Congress to levy the tax against the person who earns the income." *Id.*

The U.S. Supreme Court extends these principles to anticipatory income. In *Harrison v. Schaffner*, the court determined that when a person assigns only a portion of expected income, retaining control over the remainder, then he has not parted with anything except a partial right to income. 312 U.S. 579, 580 (1941). The court emphasized that "one who is entitled to receive at a future date, interest or compensation for services and who makes a gift of it by an anticipatory assignment, realizes taxable income quite as much as if he had collected the income and paid it over to the object of his bounty." *Id.* "Control" becomes the focus in such cases: "the power to dispose of income is the equivalent of ownership of it and that *the exercise of the power to procure its payment to another, whether to pay a debt* or to make a gift, is within the reach of the statute taxing income 'derived from any source whatever.'" *Id.* (emphasis added).

These principles forcefully rest the disputed tax obligation with the Bell Estate. First, as the Agreement indisputably recognizes, the income distributed from the BJB Estate belonged to the decedent and/or her heirs. *See* Agreement, Recital IV and ¶¶ 3 (FFC can petition "from decedent's share of any future distributions out of the BJB Estate"), 4 (heirs agree that any right, claim or interest in or to the BJB Estate to be irrevocably assigned to FFC up to $50,000.00). In executing the Agreement, the Administratrix and the Bell heirs also agreed that while they had certain rights and interests in the Bell Estate and in decedent's share of the BJB Estate, they wished to compromise claims made in the Bell Estate probate. In other words, the Bell heirs agreed that their rights to receive distributions from the Bell Estate (and thus, the BJB Estate), could be affected by FFC's claims filed with the Estate.



ORIGINAL

The undisputed acknowledgments that the decedent held a share in the BJB Estate underscore that any tax arising out of a distribution from the BJB Estate *to the decedent* is a tax on the decedent's estate, and no other party. Having earned that distribution, the decedent's Estate must bear the responsibility for paying any tax imposed on that distribution. As the above authorities dictate, even though the Estate assigned a portion of the distribution to FFC, the tax burden remains on the Estate because it is entitled to the distribution. As Justice Holmes emphasized, this result occurs regardless of the motives leading to the arrangement by which the fruits are attributable to a different tree (i.e, FFC) from that on which they grew (i.e., the Bell Estate).

This outcome is strengthened by the fact that decedent's Estate assigned some, but not all, of the distribution: Defendants and the Bell Estate limited FFC to recover no more than $50,000.00 of the decedent's share from the BJB Estate distribution. The check representing the decedent's share from the BJB Estate distribution amounted to $51,530.82, meaning that of this distribution, not all had been assigned to FFC. Even further, the Bell Estate awaits even further distributions as the $51,530.82 distribution constituted a preliminary distribution authorized by the probate court. As the probate court recognized, further assets of the BJB Estate await possible additional property sales or partition.

Also under the above authorities, when a person retains control over anticipatory income, they retain the tax burden for what the person earned as well as what the person contractually assigned. This is the case here, as the parties negotiated an assignment of anticipated income. In December 2015 the parties negotiated that FFC could claim up to $50,000.00 of decedent's share, however, the amount to be distributed did not materialize until September 2017. In negotiating with and limiting FFC to just $50,000.00, the Bell Estate continued to exert control

ORIGINAL

over assets that it had not yet possessed but expected to possess. In exerting that control--a feature of ownership--the Bell Estate also retained the tax liability.

As noted earlier, the Agreement did not contain any provision that required FFC to pay taxes on decedent's share of the BJB Estate distribution. Instead, the parties mutually agreed to release each other from the tax consequences. Abiding by the plain language of the Agreement, the Court must conclude, as a matter of law, that the Bell Estate released all other parties to the Agreement from any tax imposed on its earnings. Also, because caselaw directs that the Bell Estate, earning the BJB Estate distribution, realizes that income and therefore must pay the tax on that income, the Court must therefore conclude that no party other than the Bell Estate must pay any tax imposed as a result of the distribution from the BJB Estate.

Defendants characterize FFC's position as an attempt to "shift" its tax burden to Defendants. However, FFC's rights to the distribution arise out of the Agreement. FFC, on its own, has no tax obligation under tax law, tax caselaw, or even by contract. In other words, FFC has nothing to shift.

## C.    Other Arguments Raised by Defendants

Defendants raise other arguments which fail to alter the Court's interpretation. First, Defendants claim that the Agreement limits FFC to collect up to, but not exceeding $50,000.00 and that such amount is inclusive of taxes. Defs.' Opp'n Mot. Summ. J. at 2-3 (Mar. 30, 2018). The language of the Agreement counters Defendants' understanding because the language releases FFC from paying any other party's taxes. Moreover, holding that the Bell Estate must pay the tax because it earned the income does not mean that FFC recovers greater than $50,000.00. FFC has no tax obligation either under tax law or the Agreement, and its recovery does not increase, or decrease, because of the tax imposed on the Bell Estate.



ORIGINAL

Second, Defendants argue that they did not agree to pay the taxes on the assignment of funds to FFC. Defs.' Opp'n Mot. Summ. J. at 5. The Court must make an important distinction at this venture. There may very well be tax implications because FFC has, by way of a settlement, acquired $50,000.00. A tax on FFC for its acquisition of a $50,000.00 settlement amount remains the responsibility of FFC to pay, and Defendants would not be liable to pay any tax imposed on FFC's assets. However, the tax at issue concerns the tax arising out of the decedent's share of a distribution from the BJB Estate. When the BJB Estate distributes funds to the Bell Estate, the Bell Estate (and no other party, including FFC) bears that tax burden. On the other hand, to the extent FFC must pay a tax *after* receiving the $50,000.00, FFC contractually released Defendants from that specific tax liability.

Additionally, Defendants dedicate much of their argument as to the background of the decedent's tense familial relationship with FFC and its principal and her brother, Paul J. Bordallo. Even in light of that background, Defendants do not dispute the validity of the Agreement. Defendants also concede that despite this contentious history, they "still chose to settle the factually and legally contested debt in order to take the high road with their family." Defs.' Opp'n Mot. Summ. J. at 2. While the background provides context to the parties' overall relationship, the family issues preceding the Agreement bear no impact upon the Court's interpretation of the unambiguous agreement. As discussed earlier, the Court looks to the four corners of the Agreement to understand the parties' intent. How Paul J. Bordallo treated decedent does not alter whether decedent, Defendants, or FFC, must pay a tax on a distribution the BJB Estate to the decedent.

Defendants also ask the Court to construe the Agreement against FFC on the basis that FFC's attorney drafted the document. However, to the contrary, the parties agreed that each

ORIGINAL

party had legal advice from their attorneys and "that this Agreement shall not be deemed prepared or drafted by one party or another, or the attorneys for one party or another, and shall be construed accordingly." Agreement ¶ 15. In enforcing the intent of the parties, the Court finds that this language defeats Defendants' request to construe the Agreement in their favor. The Court also notes that even without this provision, the Court's analysis would remain the same, that is, that the Agreement releases FFC from any tax liability incurred by any other party.

Finally, Defendants claim that FFC has breached the Agreement by initiating this lawsuit. While the Agreement contains a "Covenant Not To Sue," the covenant explicitly excepts a cause of action for breach of the Agreement. FFC grounds its specific performance and declaratory relief allegations on Defendants' breach in their contractual obligations to allow FFC to recover up to $50,000.00. Therefore, the Covenant fails to apply.

**D.     Summary Judgment on Plaintiff's Claims**

The Court now addresses FFC's two primary claims for specific performance and for declaratory relief, as well as its claim for attorney's fees and costs.

The general elements of specific performance include: "clear evidence of a valid agreement, that the agreement has been partly carried into execution on one side with the approbation of the other, and that the party who comes to compel performance has performed its part or has been and remains able and willing to perform its part of the contract." 81A C.J.S. Specific Performance § 28. Other than the issue of the tax, there being no other reason propounded by Defendants to support its refusal to endorse the cashier's check, the Court grants FFC's claim for specific performance. The parties do not dispute the validity of the Agreement, and FFC has abided by its obligations under the Agreement while Defendants have refused to endorse the check; therefore, the Court concludes that specific performance is appropriate.

ORIGINAL

FFC further seeks a declaration of its rights under 7 GCA § 26801, which permits a party interested in a contract who desires a declaration of his rights or duties to seek a determination of any question arising under such contract. As discussed, FFC has an interest in the Agreement, and its rights thereunder do not include payment of taxes imposed on the Bell Estate. Defendants concede a controversy exists: "The only real controversy taking place between the parties is that Plaintiff apparently doesn't believe they should have to adhere to the provisions and conditions contained in the [Agreement], whereas Defendants assert they are bound by the signed and court approved" Agreement. Reply in Support of Defs.' Mot. Dismiss at 3 (Mar. 30, 2018). Since there is a controversy as to the parties' rights under the Agreement, and such controversy should be resolved in the best interests of the parties, and FFC prevails on its claims to be relieved from the tax burden imposed by the distribution, the Court therefore grants summary judgment in favor of FFC on its declaratory relief claim.

Finally, FFC seeks an award of attorney's fees and costs. As agreed by the parties, "in the event any action or proceeding is brought to enforce this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs . . . ." Agreement ¶ 17. The Court finds that FFC has prevailed on its claims for specific performance and declaratory judgment, and is therefore contractually entitled to reasonable attorney's fees and costs.

## IV.    **CONCLUSION AND ORDER**

The Court DENIES Defendants' Motion to Dismiss upon Defendants' withdrawal of their request to consolidate this matter with PR0075-15, and their concession that their arguments in support of its Motion to Dismiss more properly concern summary judgment.

After having reviewed all arguments submitted by the parties under both motions, the Court GRANTS FFC's Motion for Summary Judgment because, as a matter of law, its status as

ORIGINAL

an assignee of a partial distribution from the BJB Estate renders FFC not liable to pay tax on that distribution.

FFC may submit a statement of its attorney's fees and costs within 14 days of the date of this Decision and Order. Within 14 days of FFC's filing, Defendants may file a position on FFC's attorney's fees submission, but shall limit its discussion as to the reasonableness of the attorney's fees and costs, and not re-engage in the merits of the case or the Court's decision.

SO ORDERED this 29th day of May 2018.

_____
**HON. ELYZE M. IRIARTE**
**Judge, Superior Court of Guam**

SERVICE VIA COURT BOX
I acknowledge that a copy of the
original hereto was placed in the
court box of:
QBordallo
JBell
5.29.18 Time: 3 pm
_____
Deputy Clerk, Superior Court of Guam

ORIGINAL